Larkin, J.
This appeal is to review an order of the Steuben County Judge approving and confirming the adoption of Max Eugene Santacose, an infant two years'old, by the respondents herein. The appellants, whose status as interested parties is not questioned, were parties to the proceeding.
The child’s parents, Joseph and Eva Santacose, were married on January 30,1938, by a Homan Catholic priest in accordance with the tenets of that religion. Santacose, at the time of his marriage, was a Catholic, but his wife was not. After their marriage, the Santacoses lived in Steuben County. Five children were bora to .them, the youngest, the child involved herein, Max Eugene, now two years old. None of these children, except Max Eugene, were baptized as a Homan Catholic. His *13 baptism will be noted later herein. The three older children now attend the Baptist Church. The fourth child, three years old at the time this matter was heard, had not begun to attend any church.
Evidently Santacose did not look after his family very well for in April, 1944, on the petition of a .child welfare worker in the office of the Steuben County Commissioner of Public Welfare, an order was made by the Judge of the Steuben County Children’s Court placing the three youngest children, including Max Eugene, in the commissioner’s custody and directing Santacose to pay $14 per week for their support. Follow- ’ ing that order, Max Eugene was placed by the commissioner in a licensed boarding home. In May, 1944, the child was taken ill and. removed to a hospital. On May 16, 1944, it was evidently thought that he was in danger of death. A County nurse discussed his condition with the child’s mother, who had been called to the hospital. The mother testified that the nurse told her that the child should be baptized. In any event a Roman Catholic priest was called, who, with the consent of the mother, baptized the child as a Roman Catholic. In June, T944, the child, having recovered from his illness, was placed by the Commissioner of Public Welfare in another licensed boarding home operated by the respondents, Whit-comb. He was not placed with them for adoption. On the contrary, they were paid for his care1 by the county at the approximate rate of $24 per month during the time he was in their home, where he remained until October 31, 1945.
In May and June, 1945, the parents of the child signed written absolute surrenders in accordance with section 384 of the Social Welfare Law. These surrenders, in accordance with the statute, were in June, 1945, recorded in the Steuben County Clerk’s office. By their terms, each parent voluntarily and unconditionally surrendered the custody of Max Eugene Santacose to the Commissioner of Public Welfare of Steuben County, upon condition that the child should be provided with a home in the United States until he reached the age of twenty-one years. Both parents authorized and empowered the commissioner, in his discretion, to consent to the adoption of the child without notice to them.
Although the Whitcombs prior to June, 1944, had never evidenced a desire to adopt the child, it is undisputed that, between the middle of June, 1945, and October 31st following, on several occasions, when the child welfare worker in the Steuben County Welfare Commissioner’s office, in charge of Max Eugene, visited *14 their home in the course of her work, Mrs. Whitcomb spoke to her in reference to their adopting the child. She was told that due to the fact that he’ was baptized a Catholic, such adoption by them could not be authorized. During the same period, the welfare worker investigated the home of the appellants, the Stoquerts. Stoquert is a Roman Catholic but his wife is not. He is thirty-three years of age and his wife is twenty-five. They' are childless and the record indicates that it is impossible for them to have children. They were desirous of adopting a child. Evidently the worker discussed with them the adoption of Max Eugene. They agreed to rear the child as a Roman Catholic in the event that they adopted him. The welfare worker, upon investigation, determined that such adoption by this couple would be a proper one. On October 31, 1945, this worker removed the child from the Whitcomb home and placed it in the Stoquert home, clearly with the intention that if, at the expiration of the probationary period of six months required by section 112 of the Domestic Relations Law, the Stoquerts desired an order of adoption, the Commissioner of Public Welfare .of Steuben County would consent thereto, to the. end that a legal order of adoption might be made. Early in November, 1945, the Whit-combs presented a petition to the County Judge of Steuben County asking that an order of adoption be made "to them of this child. .Annexed to this petition was an agreement signed by Santacose and his wife and the Whitcombs. Upon these papers the County Judge, on November 16th, signed an order which was served upon the Stoquerts, directing them to produce the child before him on the 19th of November, 1945. Written notice was given to the Commissioner of Public Welfare of Steuben County that an application would be made by the Whitcombs on the same day for an order of adoption. Pursuant to the notice and order, the matter came on for hearing before the County Judge on November 19, 1945. The petition of the Whitcombs, the agreement between them and Joseph and Eva Santacose, the parents of the child, were filed with the court. In the course of the proceeding, the Stoquerts filed with the County Judge, .their petition seeking an order of adoption to them. They tendered a proposed agreement signed by them and to be executed by the Commissioner of Public Welfare, but it was not signed by him, consenting to the adoption. At the second hearing on November 26, 1945, the appearance of the County Welfare Commissioner was noted. He was sworn as a witness. He was asked if he consented to the adoption of this child by the Whitcombs and he stated that he did not *15 believe that he had the power to-consent, but that on the contrary, it was for the court to decide. He further stated that he would be completely satisfied with whatever disposition the court made of the matter. He also testified that the reason that he had placed the child-in the Stoquerts’ home was because that was a' Catholic home and the child had been baptized a Catholic. He explained that the original placing of the child with the Whitcombs in 1944 was because there was at that time no Catholic boarding home available for the child. It was stipulated on the hearing that the Stoquerts were receiving no pay from the county for the care of the child and that it was placed - in their home for the purpose of adoption. While the record does not distinctly show the fact, nevertheless it is clearly inferable and must be presumed that when the child was placed-with the Stoquerts, it was with the consent of the commis-' sioner and with knowledge on- his part that it was so placéd with them for adoption. The Whitcombs, the Stoquerts and ■ the Santacoses testified in the course of the proceeding. It is unnecessary to go into detail as to the testimony given by either the Whitcombs or Stoquerts. The Santacoses both stated that they preferred that the adoption be made by the Whitcombs and that the child should be reared as a Protestant.
At the conclusion of the hearings, the County Judge directed an investigation to be made of the Whitcomb home by the Commissioner of Public Welfare of the town in which they resided. Upon receiving from that official a favorable report, he made an order confirming thé adoption of this child by the Whit-combs, stating in hi-s decision that he found no reasonable opposition to their application, because they had the consent of the parents and the Welfare Commissioner had taken the position that he would be satisfied with whatever decision the court should make. In the order of adoption made by him, he directed the Stoquerts to surrender the child to the Whitcombs. The Stoquerts then appealed from this order and pending the hearing and determination of that appeal, the provision of.the. order, insofar as it required surrender by them of the child to the Whitcombs, was stayed, so that the child has remained in their custody since October 31, 1945. . - -
The propriety of adoption by either the Whitcombs or the Stoquerts is established because it is eoncedéd, and the record shows, that both are upstanding families of the community and each couple is equally fit to become the foster parents of the child. The only suggestion on the question of'the "advisability of the -adoption by either couple is found in' the testi *16 mony of the welfare worker, in charge of the case, in the office of the commissioner. Her testimony is suggestive of the inference that Giving to the ages of the prospective foster parents — Whitcomb then being forty-four and his wife forty-five years of age — coupled with the additional fact that the Whit-combs, who operate a licensed boarding home in the county, then had four other children placed there, not for adoption' but for temporary custody, she felt that, because of those circumstances, the Stoquerts’ home would be more desirable. Clearly the underlying cause which motivated the commissioner in placing the child with the Stoquerts for adoption was that he felt that since the child had been • baptized as a Roman Catholic and since the Stoquerts had agreed that they would rear the child in that religion, proper observance by him of the provisions of section 113 of the Domestic Relations Law, which requires that when practicable, custody shall be given only to the persons of the same religious faith as that of the foster child, made the adoption by the Stoquerts more desirable than by the Whitcombs.
On this appeal two questions are presented. First, whether the order of adoption had jurisdictional basis, and, second, if it did, whether the order of the County Judge in approving the adoption by the Whitcombs, gave proper regard to the requirement of section 113 of the Domestic Relations Law as to the religious faith of the foster child.
Since adoption was unknown to the. common law of England and in this State is entirely regulated by statute, it follows that like all statutory proceedings, there must be a strict observance of the statutory requirements. That such is the rule in an adoption proceeding is evidenced in numerous decisions of the courts of this State. In People ex rel. Marabottini v. Farr (33 N. Y. S. 2d 600) the late Justice Personitts, an excellent judge, states that “ numerous are the cases which hold that the ‘ statute governing adoption must be strictly complied with, since adoption is a proceeding in derogation of common law ’ ”. The authorities cited by him fully bear out his statement. In Matter of Cohen (155 Misc. 202, 205) and in Matter of Pierro (173 Misc. 123, 124) Surrogate Wingate, a judge thoroughly familiar with the question, makes the same statement as to the necessity of strict observance of statutory requirements. Again the authorities which he cites furnish basis for his statements. While there can be no question but that the validity of an adoption depends entirely upon compliance with .the statute .authorizing it, and although .this, *17 of course, may not mean a literal and meticulous compliance, it certainly means a compliance which can at least he said to be substantial.
Passing then to the statute authorizing an adoption, it is found in sections 109-118 of article VII of the Domestic Relations Law. By the express language of section 110 no person may be adopted except as provided in the article. Section 111 specifies the persons whose consents are required. By this section, the parents of a child born in wedlock must consent to his adoption. However, this same section specifies that such consent is not required where the child has been surrendered to an authorized agency. Section 112 regulates a voluntary adoption. This section requires in such a case, that the foster parents, the child and all persons whose consent is required by section 111, appear for examination before a judge or surrogate of the county where the foster parents reside. This section further makes requisite a petition signed by the foster parents and an agreement on their part to adopt and treat the foster child as their own lawful child, and the consents of those made necessary by preceding section 111. The petition must be verified and -the agreement and consents executed and acknowledged, the proof given and the affidavits required by this section must be verified before the county judge or surrogate. Before making an order of adoption, the judge or surrogate must make or cause to be made, an investigation to ascertain the propriety of approving the adoption. Section 113 seems to be, so far as this present adoption is concerned, the relevant- section. It is entitled “ Adoption from Authorized Agencies.” It provides that an authorized agency — and the Commissioner of Public Welfare by section 371 of the Social Welfare Law is an authorized agency — may consent to the adoption of a minor child in his lawful custody. It further provides that an adoption from an authorized agency shall be effected in the manner provided for Voluntary adoptions by section 112 of the same statute. The important part of section 113 is the requirement that the agreement of adoption shall he executed by such authorized agency. It clearly contemplates that where a child is lawfully in its custody, that agency is the one which must consent to the adoption. The same section further states that in making the order of adoption, the judge, when practicable, must give custody only to persons of the same religious faith as the foster child, as required by section 373 of the Social Welfare Law.
*18 ' Bearing in mind that the "Social Welfare Law provides, by section 384, for an absolute surrender to an authorized agency, of a child, which surrender shall be upon such conditions as the parties to it may agree/and ^since herein it is clearly established that such surrenders were executed by the natural parents to the commissioner, in which they authorized and empowered him in their place to consent to the adoption, reading that section of the Social Welfare Law in connection with section 113 of the Domestic Relations Law, the conclusion seems logical that the two statutes contemplate and intend that,'in such a situation as the present one, the only basis for an adoption is the execution by the'Commissioner of Public Welfare of a written consent which* takes the place of, and is so intended, the written consent of the natural parents required in the case of a voluntary adoption. By unconditionally surrendering the custody of their child to the commissioner, the Santacoses divested themselves of any power thereafter, without an abrogation'of these surrenders,' by théir written consent to authorize the adoption of this child. Any other determination would be contrary to the clear intendment of both statutes, the Domestic Relations Law and the Social Welfare Law,' which must be read together. To determine otherwise would be unsettling what seems to be the expressed policy of the State as to such adoptions. ■ Therefore, strictly construing, as is required, these statutory requirements, it seéms necessarily to follow that the adoption herein was without statutory basis.
Nor should the commissioner’s statement made in the course of the hearings that he would be satisfied with whatever determination the County Judge made, be held to be a substantial compliance with the statutory requirements. The responsibility was placed by statute on the commissioner. That responsibility he has never assumed herein. The statute places that upon him, not upon the County Judge.
It follows therefore from what.has been said, that the order of adoption herein lacked jurisdictional basis. Such a determination renders unnecessary consideration of the other question involved.
' For the foregoing, reasons, the order of adoption should be neversed and vacated, without costs.
All concur. Present — Taylor, P. J., Harris, MoCurn, Larkin and Love, JJ.
Order reversed on the law and adoption vacated, without costs of this appeal to any party.